UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------------x

EPHRIAM BLUTH, INDIVIDUALLY AND AS THE LEGAL  :
REPRESENTATIVE OF SHOSHANA BLUTH, TSIPORA      :
BATYA BLUTH REICHER, ISAAC MENACHEM BLUTH,     :
YIGAL AMICHAI BLUTH, ARYEH YEHUDA BLUTH,        :
CHANINA SAMUEL BLUTH, ABRAHAM AHARON BLUTH, :
JOSEPH SHIMSHON BLUTH, NATHAN PAM, RAZIEL PAM, :
NEEMAH PAM FISHER, BARUCH TRATNER, JUDITH       :          **COMPLAINT**
TRATNER, DRORA WIZNER, RIVKA SELZER,             :
AND BELKA GEZ                                     :          **No.**   18-CV-7465
                                                 :
                                Plaintiffs,       :
                                                 :          Jury Trial Demanded
                                                 :
                                                 :
              -against-                           :
                                                 :
NATIONAL WESTMINSTER BANK, PLC,                  :
                                                 :
                                Defendant.        :
                                                 :
--------------------------------------------------------------------------------x

The Plaintiffs in this action ("Plaintiffs"), by their attorneys, respectfully allege the

following upon information and belief.  The Plaintiffs include: Ephriam Bluth, individually and as

the Legal Representative of Shoshana Bluth, Tsipora Batya Bluth Reicher, Isaac Menachem Bluth,

Yigal Amichai Bluth, Aryeh Yehuda Bluth, Chanina Samuel Bluth, Abraham Aharon Bluth, and

Joseph Shimshon Bluth (collectively, the "Bluth Plaintiffs"); Nathan Pam, Raziel Pam, and

Neemah Pam (collectively, the "Pam Plaintiffs"); and Fisher Baruch Tratner, Judith Tratner, Drora

Wizner, Rivka Selzer, and Belka Gez (collectively, the "Tratner Plaintiffs").

## NATURE OF THE ACTION

1.     This action is related to the action pending in this Court before the Hon. Dora L. Irizarry captioned *Applebaum, et al. v. National Westminster Bank, PLC*, Civil Action No. 1:07-cv-917.

2.     Plaintiffs in the *Applebaum* action seek damages from defendant National Westminster Bank, Plc ("NatWest") as a result of NatWest's knowing provision of financial services to the foreign terrorist organization HAMAS.  By engaging in that misconduct, NatWest aided and abetted the commission of acts of international terrorism, including the terror attacks that injured the *Applebaum* plaintiffs.

3.     All of the claims at issue in this action relate to the terror attacks that are before the Court in the *Applebaum* action, and all of the Plaintiffs in this action are family members of existing plaintiffs in *Applebaum*.

4.     In bringing this action, Plaintiffs rely upon the *Applebaum* Court's prior decision that it may exercise specific personal jurisdiction over NatWest in connection with the attacks at issue as a result of its contacts with New York and with the United States.[1]

5.     In addition, in this Complaint, Plaintiffs have deliberately adhered to the allegations in the operative Amended Complaint in *Applebaum*, and have not added allegations from the existing summary judgment record in the case or cited to additional evidence gained in discovery. Nor are Plaintiffs asserting any claims that the *Applebaum* plaintiffs have not alleged; rather, Plaintiffs have conformed their claims to the operative causes of action set forth in the parties'

---

[1] The Court's decision is attached as Exhibit A to the Complaint and is incorporated herein by reference pursuant to Fed. R. Civ. P. 10(c).

joint pretrial order in *Applebaum* and in the *Applebaum* plaintiffs' opposition to NatWest's motion for summary judgment.

6.  NatWest is incorporated and headquartered in the United Kingdom. It knowingly provided financial services and collected and transmitted money for the benefit of HAMAS,[2] a Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")).

7.  By engaging in that misconduct, NatWest substantially assisted in the commission of acts of international terrorism, as defined by 18 U.S.C. § 2331.  In addition, NatWest aided and abetted the commission of acts of international terrorism that injured Plaintiffs and violated the criminal prohibitions on providing material support for acts of international terrorism, as set forth in the Antiterrorism Act ("ATA"), as amended by the AEDPA (*see, e.g.*, 18 U.S.C. §§ 2339B and 2339C).

8.  As a result, NatWest is civilly liable under § 2333(a) of the ATA to Plaintiffs, who have been injured in their person by reason of acts of international terrorism perpetrated by HAMAS.

## JURISDICTION AND VENUE

9.  This case is a civil action brought by citizens of the United States, their estates, survivors, and heirs, all of whom have been killed or injured by reason of acts of international terrorism.  As a result, this Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 2333 and 2334.

---

[2] HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya" also known as the "Islamic Resistance Movement."

10.     Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. §§ 1391(c)(3) and (d).

11.     NatWest is subject to personal jurisdiction in this Court for all of the reasons identified by the *Applebaum* Court in Exhibit A hereto. NatWest is subject to personal jurisdiction in the United States pursuant to Fed. R. Civ. P. 4(k) because, among other things, it continuously and systematically does business in the United States.  NatWest is also subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2339B(d)(1)(D) because it has committed tortious acts within the United States by transferring funds through the United States for the benefit of HAMAS, and has purposefully availed itself of United States jurisdiction in the course of committing the wrongful acts alleged herein.

12.     NatWest is also subject to personal jurisdiction under CPLR 302 because, among other reasons: (a) it transacts business within New York and contracts to supply services within New York; (b) it committed tortious acts within New York; and (c) it committed tortious acts outside of New York that caused injury within New York and (i) it regularly does and solicits business, engages in other persistent conduct, and derives substantial revenue from services rendered in New York and (ii) it expected or should reasonably have expected its conduct to have consequences within New York and it derives substantial revenue from interstate and  international commerce.

## THE PARTIES

### A.     The Plaintiffs

### Bluth Plaintiffs

13.     Nethaniel Bluth is a citizen of the United States who for some time has resided in Israel with his parents, Ephraim and Shoshana.  On March 7, 2002, Nethaniel was a 19-year-old

student at Otzem, a school located in the community of Atzmona, Israel.  Nethaniel began his studies there in August, 2001.

14.     On March 7, 2002, while Nethaniel was studying with about 80 other students in a lesson being led by a rabbi, a small explosion occurred.  Nethaniel and the other students rushed to the window to see what had happened.  A Palestinian terrorist who was in the midst of attacking the students had thrown a grenade into one of the dorm rooms.

15.     It was late at night, around 11:00 p.m., and the students looked in horror as the terrorist opened fire on them with a burst from an automatic weapon.  The attacker threw additional grenades in an attempt to kill and injure as many of the students as possible.  Nethaniel was struck by shrapnel when a grenade exploded only a few feet from him.  His arms, legs and scalp were injured.  One piece of shrapnel pierced his chest and hit his chest bone.  He suffered pain, trauma, mental anguish and extreme emotional distress, all to his damage.

16.     HAMAS claimed responsibility for the attack, which was committed by Mohammed Fathi Farahat, a/k/a Mohammed Nadal Farhath, a HAMAS agent.

17.     This terror attack was within the scope of the scheme and conspiracy described below in which NatWest was a knowing and active participant.

18.     Nethaniel was rushed to Tel HaShomer Hospital for surgery to save his life.  Five of his classmates were murdered in the attack.

19.     Nethaniel underwent three surgical procedures following the attack.  His chest wound was closed, a gash in his scalp was surgically treated and the various wounds to his arms were stitched.  Nethaniel has scars from these injuries.

20.     After rehabilitation, Nethaniel regained most of the use of his hands, arms and legs. He also suffered severe damage to both of his ear drums when the grenade exploded close to him. His hearing is permanently impaired in his left ear.

21.     Nethaniel Bluth is a plaintiff in *Applebaum, et al. v. National Westminster Bank, PLC*, Civil Action No. 1:07-cv-917-DLI-MDG.

22.     Plaintiff Ephriam Bluth is a citizen of the United States and a resident of the State of Israel.  He is the father of Nethaniel Bluth.  As a result of the attack upon his son, Nethaniel, Ephriam Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

23.     Plaintiff Ephriam Bluth is the sole legal heir of Shoshana Bluth.  Shoshana Bluth was the mother of Nethaniel Bluth.  As a result of the attack upon her son, Nethaniel, Shoshana Bluth suffered severe mental anguish and extreme emotional pain and suffering prior to her death.

24.     Plaintiff Tsipora Batya Bluth Reicher is a citizen of the United States and a resident of the State of Israel.  She is the sister of Nethaniel Bluth.  As a result of the attack upon her brother, Nethaniel, Tsipora Batya Bluth Reicher has suffered severe mental anguish and extreme emotional pain and suffering.

25.     Plaintiff Isaac Menachem Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his brother, Nethaniel, Isaac Menachem Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

26.     Plaintiff Yigal Amichai Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his brother, Nethaniel, Yigal Amichai Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

27.     Plaintiff Aryeh Yehuda Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his brother, Nethaniel, Aryeh Yehuda Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

28.     Plaintiff Chanina Samuel Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his brother, Nethaniel, Chanina Samuel Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

29.     Plaintiff Abraham Aharon Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his brother, Nethaniel, Abraham Aharon Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

30.     Plaintiff Joseph Shimshon Bluth is a citizen of the United States and a resident of the State of Israel.  He is the brother of Nethaniel Bluth.  As a result of the attack upon his brother, Nethaniel, Joseph Shimshon Bluth has suffered severe mental anguish and extreme emotional pain and suffering.

**Pam Plaintiffs**

31.     On June 11, 2003, 16-year-old Rivka Reena Pam was on Bus No. 14A in Jerusalem, Israel.  Around 5:30 p.m., an individual dressed as an ultra-orthodox Jew boarded Egged Bus No. 14A at the Mahane Yehuda market.  A short while later, as the bus drove down Jaffa Road, within Jerusalem, Israel, the terrorist detonated his bomb, wrecking the bus and killing sixteen passengers. Over 100 people were wounded, including dozens of passersby.

32.     HAMAS claimed responsibility for the bombing.  The suicide bomber who acted for HAMAS to commit this brutal attack was Abed Al Mo'ti Mohammad Shabana.  He carried a huge bomb containing a great deal of metal fragments that caused massive injuries.

33.     This terror attack was within the scope of the scheme and conspiracy described below in which NatWest was a knowing and active participant.

34.     Rivka works with children and this teenager's life has changed dramatically as a result of her injuries in this terrorist incident.  She was hospitalized for a number of days in intensive care, suffered burns, lung damage, eye injury, scarring and severe hearing loss, which requires future medical and surgical care.  Her happy outgoing personality has been affected because of the severe emotional distress, hearing loss, pain, suffering, mental anguish, and trauma that she has experienced from this terrorist attack, all to her damage.

35.     Rivka Reena Pam is a plaintiff in *Applebaum, et al. v. National Westminster Bank, PLC*, Civil Action No. 1:07-cv-917-DLI-MDG.

36.     Plaintiff Natan Pam is a citizen of the United States and resident of California.  He is the brother of Rivka Reena Pam.  As a result of the attack upon his sister, Rivka, Nathan Pam has suffered severe mental anguish and extreme emotional pain and suffering.

37.     Plaintiff Raziel Pam is a citizen of the United States and resident of California.  He is the brother of Rivka Reena Pam.  As a result of the attack upon his sister, Rivka, Raziel Pam has suffered severe mental anguish and extreme emotional pain and suffering.

38.     Plaintiff Neemah Pam Fisher is a citizen of the United States and a resident of the State of Israel.  She is the sister of Rivka Reena Pam.  As a result of the attack upon her sister, Rivka, Neemah Pam Fisher has suffered severe mental anguish and extreme emotional pain and suffering.

**Tratner Plaintiffs**

39.     On September 24, 2004, Tiferet Tratner, a 24-year-old American citizen who worked with the elderly and with people with disabilities, was killed by a terrorist mortar attack launched from or near the Gaza Strip as she sat on the couch in her home in Neve Dekalim, Israel. This murder took place the day before Yom Kippur.  The Estate of Tiferet Tratner is a plaintiff in *Applebaum, et al. v. National Westminster Bank, PLC*, Civil Action No. 1:07-cv-917-DLI-MDG.

40.     HAMAS claimed responsibility for the terror attack and was in fact responsible.

41.     This terror attack was within the scope of the scheme and conspiracy described below in which NatWest was a knowing and active participant.

42.     Plaintiff Baruch Tratner is a citizen of the United States and a resident of the State of Israel.  He is the brother of Tiferet Tratner.  As a result of the attack upon his sister, Tiferet, Baruch Tratner has suffered severe mental anguish and extreme emotional pain and suffering.

43.     Plaintiff Judith Tratner is a citizen of the United States and a resident of the State of Israel.  She is the sister of Tiferet Tratner.  As a result of the attack upon her sister, Tiferet, Judith Tratner has suffered severe mental anguish and extreme emotional pain and suffering.

44.     Plaintiff Drora Wizner is a citizen of the United States and a resident of the State of Israel.  She is the sister of Tiferet Tratner.  As a result of the attack upon her sister, Tiferet, Drora Wizner has suffered severe mental anguish and extreme emotional pain and suffering.

45.     Plaintiff Rivka Selzer is a citizen of the United States and a resident of the State of Israel.  She is the sister of Tiferet Tratner.  As a result of the attack upon her sister, Tiferet, Rivka Selzer has suffered severe mental anguish and extreme emotional pain and suffering.

46.     Plaintiff Belka Gez is a citizen of the United States and a resident of the State of Israel.  She is the sister of Tiferet Tratner.  As a result of the attack upon her sister, Tiferet, Belka Gez has suffered severe mental anguish and extreme emotional pain and suffering.

**B.     The Defendant**

47.     NatWest is a British financial institution with its principal place of business in London, United Kingdom.  It is part of the Royal Bank of Scotland Group.

48.     NatWest conducts business in the United States and in New York, both directly and through its agents.  During the time period relevant to this action, NatWest maintained offices in Manhattan and in Stamford, Connecticut.  NatWest listed the Stamford location as one of its "principal offices" in annual reports that it issued during the relevant time period.

49.     In *Applebaum*, the Court has found that NatWest is subject to specific personal jurisdiction in this Court as a result of its contacts with New York and with the United States.  *See* Exhibit A hereto.

## FACTUAL ALLEGATIONS

**A.     The Islamic Resistance Movement ("HAMAS")**

**1.     The Founding of HAMAS**

50.     In December 1987, Sheik Ahmed Yassin formed the Palestinian Islamic Resistance Movement ("HAMAS") as an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II.

51.     Pursuant to its charter, HAMAS and its operatives plan, assist, and conduct acts of international terrorism in Israel and the Gaza Strip, including the attacks that injured Plaintiffs.

### 2.     **Formal Designations of HAMAS as a Terrorist Organization**

52.     In 1989, the Government of Israel declared HAMAS a terrorist organization and also declared it an "unlawful organization" because of its terrorist acts.  Notice of the designation was placed in an official Government of Israel publication, the Announcements and Advertisements Gazette.

53.     Initially, HAMAS specialized in kidnapping and executing people suspected of cooperating with Israel.  It quickly evolved and broadened its operations so that, by the early 1990's, it specialized primarily in murdering civilians in Israel.

54.     For example, on April 6, 1994, a HAMAS suicide bomber blew up a bus in Afula, killing eight (8) people.

55.     On April 13, 1994, a HAMAS suicide bomber blew up a bus in Hadera, killing five (5) people.

56.     On October 19, 1994, a HAMAS suicide bomber blew up a bus in Tel Aviv, killing twenty-two (22) people.

57.     On January 23, 1995, President Clinton issued Executive Order 12947.  President Clinton found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

58.     Executive Order 12947 designated HAMAS a Specially Designated Terrorist ("SDT").  Executive Order 12947 blocked all property and interests in property of the terrorist organizations and persons designated in the Order, including HAMAS.

59.     On February 25, 1996, a HAMAS suicide bomber blew up a bus in Jerusalem killing twenty-six (26) people, three (3) of whom were U.S. citizens, and injuring eighty (80) people, three (3) of whom were U.S. citizens.  HAMAS claimed responsibility for the bombing.

60.     On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS an FTO pursuant to Section 219 of the Immigration and Nationality Act and the AEDPA.  This designation has been renewed every two years since 1997.

61.     After the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order 13224, declaring a national emergency with respect to the "grave acts of terrorism … and the continuing and immediate threat of further attacks on United States nationals or the United States."

62.     Executive Order 13224 designated HAMAS a Specially Designated Global Terrorist ("SDGT").  The Executive Order also blocked all property and interests in property held by the SDGTs, including HAMAS.

### 3.     HAMAS's Organizational Structure and Fundraising Network

63.     HAMAS's terrorist operations depend upon its religious and social activities to recruit, educate and train terrorists and to collect material and aid.  Its terrorist operations and social activities operate side-by-side and support each other.

#### a.     The "Dawa"

64.     HAMAS's infrastructure in the Palestinian Authority-controlled territory ("the PACT") is comprised of two interwoven components: its terrorist apparatus and its religious and social infrastructure, which is responsible for recruiting and training terrorists.  This patchwork of charitable and social institutions is commonly referred to by HAMAS as the "Dawa."

65.     For the purpose of raising funds for its operations, HAMAS has established "charity" committees across the PACT and abroad, including committees in Ramallah, Jenin, and Tulkarem that are controlled by HAMAS agents and that collect and distribute their funds on behalf of HAMAS.[3]

66.     These "charities" channel funds to pay expenses for, and assist the families of, terrorist operatives who are arrested, injured or killed.  These entities also assist with the provision of housing subsidies to the families of suicide bombers, whose homes are often demolished by the Israeli army after the bombers' identities are confirmed.

67.     These "charities" and other supposed "charitable" associations not only help raise funds for HAMAS's terrorist operations, but also help HAMAS identify and recruit potential terrorists.  The network of supposed charities assists recruitment, in part, by funneling money to pay benefits to the families of terrorist operatives who are arrested, injured or killed.

68.     Nonetheless, HAMAS like other foreign terrorist organizations, collects funds under the guise of political or humanitarian activities.  This fundraising ultimately supports the kind of terrorist activities that injured Plaintiffs.

**b.     HAMAS's Terrorism Financing**

69.     Funds raised by or on behalf of HAMAS for "charitable purposes" are used to finance its terrorist activities.  As Congress found when passing the AEDPA: "Foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct."  Antiterrorism Act of 1996, Pub. L. No. 104-132, § 301 (a)(7), 110 Stat, 1247.

---

[3] There are approximately 80 such "charitable" committees in the West Bank and Gaza Strip. Those entities are nominally supervised by the Palestinian Authority's Ministry of Waqf and Religious Affairs.

70.     HAMAS receives a majority of its financing through donations coordinated by prominent Saudi and Gulf State charities and the global network of charities known as the Union of Good, which is operated by the Muslim Brotherhood.  The Union of Good, in turn, raises funds that are, in part, channeled through an entity known as the Palestine Relief and Development Fund and/or Interpal ("Interpal"), which maintained several accounts with NatWest during the time period relevant to this action.

### c.     The Union of Good

71.     I'Tilafu Al-Khayr, a/k/a the Union of Good, is an umbrella organization established by the Muslim Brotherhood in October 2000, immediately following the outbreak of the violent Palestinian terrorist uprising commonly termed the "Second Intifada."

72.     The Union of Good is thus a principle fundraising mechanism for HAMAS.

73.     The Union of Good's primary "charitable" purpose is to provide financial support for HAMAS and its agents in the PACT.

74.     The Union of Good is comprised of more than fifty (50) Islamic charitable foundations worldwide.  The U.S. government has designated several of these foundations, including Interpal and the Al-Aqsa Charitable Foundation, as SDGTs.

75.     The U.S. Government designated Interpal an SDGT on August 22, 2003, and designated the Al-Aqsa Charitable Foundation an SDGT on May 29, 2003.

76.     During the relevant time period, NatWest maintained a U.S. Dollar account for the Union of Good with the account number 140-00-08537933.

77.     The Union of Good uses Interpal as its principal clearing house for funds raised throughout Europe and the Middle East.

78.     For example, Plaintiffs discovered that the Union of Good's "101 Days Campaign" maintained its own website at www.101days.org.  That campaign solicited funds for HAMAS and directed prospective donors to donate via Interpal's NatWest account numbers 60082295142940 (Sterling) and 60720508524882 (Euros).

79.     During the relevant time period, Interpal's own website directly manifested the symbiotic link between the Union of Good and Interpal.  The Interpal website solicited donations for the Union of Good and explicitly stated:

> Any donation that is made to INTERPAL through this web page is distributed with the knowledge and approval of the other members of the Union for Good directly to the charities in Palestine that are implementing the work creation programs [sic].[4]

80.     The Union of Good is headed by Dr. Yussuf al-Qaradawi, an extremist Sunni Muslim scholar based in Qatar.  During the time period relevant to this action, NatWest was well aware of al-Qaradawi's connections to terrorism and his connection to Interpal.

81.     To begin with, al-Qaradawi has been on the U.S. Watch List since November 1999 and cannot travel to the United States.

82.     Al-Qaradawi was also a leading shareholder and principal in the Al Taqwa Bank, which was officially designated as an SDGT on November 7, 2001, because of its ties to fundraising and money laundering for al Qaeda and HAMAS.

83.     Nor is al-Qaradawi an obscure or shadowy figure.  On the contrary, he had his own weekly television program on Al Jazeera and has very publicly issued an Islamic religious edict (fatwa) authorizing suicide bombing attacks against Israel.[5]

---

[4] http://www.interpal.org/web/101.htm

[5] Al-Qaradawi was also the first scholar who authorized women to commit suicide attacks (March 2002) in the context of the second Intifada, as cited in HAMAS's official website: http://www/palestine-info.info/arabic/fatawa/alamalyiat/qaradawi.htm.

84.    In fact, on April 14, 2002, al-Qaradawi appeared on Al Jazeera extolling "jihad and martyrdom" against Israelis and denouncing the U.S. designation of HAMAS and other terrorist organizations.

85.    Although the Union of Good and other fundraising organizations for HAMAS speak only generally about the Intifada and the families of the "martyrs," NatWest was, during the time period relevant to this action, in a unique position to monitor and quantify most of the transactions flowing into the Union of Good and Interpal accounts.  NatWest was also in a position to monitor and determine the identities of the entities to which the Union of Good and Interpal transmitted the funds that they collected via NatWest accounts.

86.    Thus, while the 101 days website spoke obliquely of supporting "the families of the injured and the martyred in particular," NatWest, at all relevant times, had direct, first-hand knowledge of the organizations to which this "support" has been transmitted.  Those organizations included dozens of notorious HAMAS front organizations.

87.    As recently as October 29, 2005, in an interview with The Guardian newspaper, al-Qaradawi discussed suicide bombing in Israel.  The article quoted him as saying:

> The actor who commits this is a martyr because he gave his life for the noble cause of fighting oppression and defending his community.  These operations are best seen as a weapon of the weak against the powerful.  It is a kind of divine justice when the poor, who don't have weapons, are given a weapon which the fully equipped and armed-to-the-teeth powerful don't have – the powerful are not willing to give their lives for any cause.

88.    More importantly, al-Qaradawi's views and activities have been a matter of public records for many years.[6]

---

[6] Al-Qaradawi was the subject of massive publicity in Great Britain when he was invited to London by its mayor in July 2004, but his prominence long pre-dated that event.

89.     Through his many public appearances and popular television program, al-Qaradawi has never concealed his views about the moral rectitude of murdering Jews and Israelis.

90.     To take just one example, in a September 1999 article in the Palestine Times, entitled "Sheikh Yousuf al-Qaradawi: Hamas and the Islamic Jihad Represent the Glorious Face of the Islamic Umma – Interview," al-Qaradawi blessed "the martyrdom operations in which a given Moslem fighter turns himself or herself into a human bomb that casts terror in the hearts of the enemy." He further stated, "If we can't carry out acts of Jihad [holy war] ourselves, we at least should support and prop up the Mujahideen [holy warriors] financially and morally so that they will be steadfast until God's victory."

91.     At all relevant times, NatWest was aware of al-Qaradawi's views. More importantly, NatWest had specific and detailed knowledge of how al-Qaradawi and his myriad of charitable front organizations channeled funds to HAMAS because millions of dollars passed through accounts held at NatWest.

92.     Al-Qaradawi might be considered the "chairman of the board" of HAMAS's global fundraising efforts, but Issam Yusuf a/k/a Issman Yusuf Mustafa is the operational head (Vice Chairman and Managing Trustee) of the Union of Good. He is a HAMAS agent and former vice chairman of Interpal, and he managed HAMAS's day-to-day fundraising efforts.

93.     During the time period relevant to this action, the board of directors of the Union of Good included three senior HAMAS figures: Sheikh Hamid al-Bitawi, Dr. Essam Salhoub, and Bassam Jarrar.

94.     In 2001, al-Qaradawi publicly described the activities of the Islamic charitable societies sustaining the Intifada against Israel as a "new type of jihad, financial jihad, through

which financial support is guaranteed to the martyrs' families, Palestinian prisoners and detainees, and every Palestinian whose property is damaged during the conflict."

95.     Until after the filing of *Applebaum, et al. v. National Westminster Bank, PLC*, Civil Action No. 1:07-cv-917-DLI-MDG, NatWest collected and transmitted funds on behalf of the Union of Good and its largest fundraising arm, Interpal.

### 4.     HAMAS Carries Out Repeated Terrorist Attacks While NatWest Maintains Its Relationship with Interpal

96.     Charitable donations to the Union of Good are partially collected and distributed through Interpal.

97.     Interpal was founded in 1981 as the Palestine and Lebanon Relief Fund and was reincorporated as Interpal in November 1994.

98.     On or before January 1, 1996, Interpal opened one or more accounts with defendant NatWest.

99.     The Charity Commission, established by law as a regulator and registrar for charities in England and Wales, froze Interpal's accounts at NatWest in March 1996 based on evidence that Interpal was channeling money to HAMAS.

100.    The allegations of links between Interpal and HAMAS were published in numerous British newspapers at the time, including The Guardian and The Times of London.[7]

---

[7] Richard Norton-Taylor and Ian Black, *Palestinian Charity Funds Frozen Over 'Hamas Link,'* THE GUARDIAN, Mar. 9, 1996; Richard Norton-Taylor, *News in Brief: Palestinian Group Cleared,* THE GUARDIAN, Mar. 13, 1996; Julian Borger, *Close Trust, Israel Pleads; Britain is being asked to clamp down on Palestinian fundraisers,* Sept. 7, 1997; Stewart Tendler and Christopher Walker, *M15 study 'charity cash linked to Hamas,'* THE TIMES, Mar. 6, 1996; Stewart Tendler, *Charity's funds are frozen all over alleged Hamas link,* THE TIMES, Mar. 9, 1996; Adrian Lee and Michael Evans, *M15 traces network of Hamas funding,* THE TIMES, Mar. 11, 1996.

101.    A spokesman for the Charity Commission told The Guardian that Interpal's bank accounts had been frozen "as a precautionary measure."  Following the widely published reports of Interpal's links to HAMAS, NatWest took no action to terminate its relationship with Interpal.[8]

102.    The Charity Commission ultimately unfroze the accounts, ostensibly because the British government distinguished (at the time) between the military and social or charitable wings of HAMAS.  There was no finding by the Charity Commission concerning Interpal's relationship with HAMAS per se, nor did Interpal attempt to deny that it was transferring millions of dollars to HAMAS.

103.    The Charity Commission's May 30, 1996 report concerning Interpal stated its findings as follows:

> Poverty and need must however be the only criteria when deciding how the charity's funds are distributed and aid must not be given because of a person's support for terrorism.  We found no evidence in the charity (Interpal) of any pro-terrorist bias, or indeed bias of any kind.

104.    Thus, the Charity Commission finding was that Interpal donated funds [to HAMAS] without any evident intent to support terrorism per se or, as the Commission put it, without "any pro-terrorist bias".

105.    U.S. anti-terrorism laws, however, do not distinguish between "biased" and "unbiased" support provided to designated FTOs.

106.    As Kenneth R. McKune, Associate Coordinator for Counterterrorism at the U.S. Department of State, noted in a sworn declaration on April 21, 1998:

> [T]he Antiterrorism and Effective Death Penalty Act of 1996 prohibits the provision of material support or resources to foreign terrorist groups that have been formally designated, pursuant to statute, as "foreign terrorist organizations" by the

---

[8] In an interview reported in THE GUARDIAN on August 7, 1997, Mr. Ibrahim Hewitt, Chairman of Interpal, publicly acknowledged that it was possible that some of Interpal's beneficiaries in the Palestinian territories have been established by HAMAS.

Secretary of State.  In prohibiting comprehensively the provision of such support and resources, the law does not differentiate between the criminal, terrorist activities of these organizations, and the civil non-violent activities, if any, in which they might engage.  In legislating this particular dimension of the "material support" ban, the Congress found that "foreign organization that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitated that conduct."

107.    NatWest nonetheless provided funds for institutions that belonged to HAMAS's financial infrastructure in the PACT, including many entities the Government of Israel had declared unlawful and that the U.S. Department of Justice had identified as agents of HAMAS.

108.    Following the March 1996 British investigation that first placed NatWest on notice that it was transferring funds to HAMAS, Interpal was declared an "unlawful organization" by the Government of Israel in May 1997 because of its fundraising activities on behalf of HAMAS. Notice of the designation was placed in an official Israeli Government publication, the Announcements and Advertisements Gazette.

109.    Despite this designation, NatWest did not cease providing financial services to Interpal.

110.    Interpal was further designated a terrorist organization in January 1998 by the Government of Israel.  Notice of the designation was also placed in the Announcements and Advertisements Gazette.

**B.**    **NatWest's Material Support for HAMAS's Terrorist Activity**

    **1.**    **NatWest's Transfers of Assets to HAMAS Entities**

111.    Despite Interpal's designation as a terrorist organization, and NatWest's knowledge that it was providing financial services to an FTO, NatWest did not cease providing financial services to Interpal.

112.    During the time period relevant to this action, NatWest provided financial services to HAMAS via various HAMAS-controlled institutions including, but not limited to: the Orphan Care Society of Bethlehem, Al-Islah Charitable Society in Ramallah-Al-Bireh, the Ramallah-Al-Bireh Charitable Society, the Jenin Charity Committee, the Hebron Islamic Association, the Tulkarem Charity Committee, Al-Mujama al-Islami, the Islamic Society in the Gaza Strip, and the Muslim Youth Association of Hebron.[9]

113.    The Orphan Care Society of Bethlehem was outlawed by the Government of Israel in February 2002.  Most of its chief functionaries, including its director, Dr. Ghassan Harmass, are HAMAS terrorists.  The Orphan Care Society pays subsidies to the children of HAMAS "martyrs" and imprisoned HAMAS members.[10]

114.    The 2001 version of Interpal's website stated that Interpal "works closely with" the Orphan Care Society.

115.    On August 16, 2002, NatWest transferred $1,875.65 ($1,906 minus commission) from Interpal to the Orphan Care Society.

116.    On September 17, 2002, NatWest transferred £6,533.00 (£6,547 minus commission, or approximately $10,069.30) from Interpal to the Orphan Care Society.

117.    On November 15, 2002, NatWest transferred £5,693 (£5,707 minus commission, or approximately $8,989.82) from Interpal to the Orphan Care Society.

---

[9] The Jenin Charity Committee and Tulkarem Charity Committee (among others) were specifically identified as HAMAS-controlled organizations by the United States Government in the July 2004 criminal indictment of the Holy Land Foundation for Relief and Development in the Northern District of Texas.

[10] In an interview published on the 101 days website, Dr. Harmass stated that Interpal is one of the Orphan Care Society's largest sources of donations: http://www.101days.org/arabic/taqareer/yateem.htm.

118.    The Islamic Society of Gaza is an alter-ego of HAMAS.  Its directors and employees are members of HAMAS and its offices serve as a principal headquarters of HAMAS in the Gaza Strip.  Since at least 1996, NatWest has transferred funds to the Islamic Society of Gaza on Interpal's behalf.

119.    The Al-Islah Charitable Society in Ramallah-Al-Bireh was founded in 1997.  The Government of Israel declared the Al-Islah Charitable Society an "unlawful organization" in February 2002.  The "charity" is run by HAMAS terrorists, and it provides aid to HAMAS terrorists, the families of "martyrs," and Palestinians wounded or imprisoned as a result of violent confrontations with Israel.

120.    The Jenin Zakat Committee was declared an "unlawful organization" by the Government of Israel in February 2002.  This "charity" is run by HAMAS terrorists, and it provides aid to HAMAS terrorists, the families of "martyrs," and Palestinians wounded or imprisoned as a result of violent confrontations with Israel.

121.    The 2001 version of Interpal's website states that Interpal "works closely with" the Jenin Zakat Committee.

122.    On May 2, 2003, NatWest transferred £15,687 (£15,713 minus commission, or approximately $25,285.90) from Interpal to the Jenin Zakat Committee.

123.    On July 11, 2003, NatWest transferred £15,330 (approximately $25,064.50) from Interpal to the Jenin Zakat Committee.  NatWest charged a commission of £11.

124.    The Tulkarem Charity Committee was founded in 1981.  The Government of Israel declared the Tulkarem Charity Committee an "unlawful organization" in February 2002. The Committee is headed by a HAMAS terrorist.

125.    In 2002 alone, NatWest transferred over $1,500,000.00 to the HAMAS front organizations listed in paragraph 112.  All of those organizations had previously been designated as unlawful organizations by the Government of Israel because of their affiliation with HAMAS.

### 2.  Funds Collected by NatWest from Specially Designated Global Terrorists and Convicted Fundraisers for HAMAS

126.    On at least three separate occasions, NatWest accepted deposits on behalf of Interpal from organizations and entities whose terrorist connections are a matter of public record.

127.    In April 2000, NatWest accepted a deposit of $66,000.00 for Interpal from the Holy Land Foundation for Relief and Development ("HLF").[11]

128.    According to a prior version of Interpal's website (dating back to August 2001), Interpal directed persons wishing to make "international donations" to donate to HLF.

129.    On December 4, 2001, the U.S. Secretary of Treasury determined that HLF was subject to Executive Orders Nos. 12947 and 13224 because HLF "acts for or on behalf of" HAMAS.

130.    Accordingly, HLF was designated an SDT under Executive Order No. 12947 and an SDGT under Executive Order No. 13224.

131.    In December 2001, the Counsel of the European Union designated HLF as a terrorist entity under Article 2(b) of Regulation (EC) No. 2580/2001.  That regulation governed specific restrictive measures directed against certain persons and entities with a view to combating terrorism and repealed Decision 2005/848/EC.

---

[11] On May 6, 1997, the Government of Israel designated HLF as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks…"

132.    In order to facilitate the application of financial sanctions, the European Banking Federation, the European Savings Banks Group, the European Association of Co-operative Banks and the European Association of Public Banks (the "EU Credit Sector Federations") and the European Commission recognized the need for an EU consolidated list of persons, groups and entities subject to financial sanctions imposed pursuant to the EU's Common Foreign & Security Policy.  It was therefore agreed that the EU Credit Sector Federations would set up a database containing the consolidated list for the European Commission, which would host and maintain the database and keep it up-to-date.  This database was developed first and foremost to assist the members of the EU Credit Sector Federations in their compliance with financial sanctions. HAMAS and HLF were listed as sanctioned entities in the database in December 2001.

133.    On March 11, 2002, HLF filed suit seeking to enjoin the U.S. Government from continuing to block or freeze its assets.

134.    On August 8, 2002, the United States District Court for the District of Columbia issued a written opinion in *Holy Land Foundation for Relief and Development v. Ashcroft*, 219 F. Supp. 2d 57, 70 (D.D.C. 2002).  The court found that "between 1992 and 1999, HLF contributed approximately 1.4 million dollars to eight Hamas-controlled 'zakat' (or charity) committees…. HLF grant lists also establish that, between 1992 and 2001, HLF gave approximately five million dollars to seven other Hamas-controlled charitable organizations, including a hospital in Gaza."[12]

---

[12] In fact, in November 2001, the FBI identified eight (8) charitable fronts as agents of HAMAS, at least 6 of which have been NatWest wire transfer recipients.  *See* Memorandum of Dale L. Watson, the Assistant Director of the FBI's Counterterrorism Division, written to R. Richard Newcomb, Director of the United States Treasury Department's Office of Foreign Assets Control, dated November 5, 2001.

135.    The publicly available 2002 court decision sets forth with specificity the legal basis for concluding that HLF's conduct – which is nearly identical to that of Interpal – constituted support for terrorism.

136.    Like HLF, the Al-Aqsa Charitable Foundation is a critical part of HAMAS's transnational terrorist support infrastructure.  The Al-Aqsa Foundation also maintained branch offices in The Netherlands, Denmark, Belgium, Sweden, Pakistan, South Africa, Yemen and elsewhere.

137.    On March 27, 2003, NatWest deposited at least two payments to Interpal totaling 295,000 Euros from the Dutch branch of the Al-Aqsa Foundation.[13]

138.    Two months later, on May 29, 2003, the U.S. Treasury Department added the Al-Aqsa Foundation to its list of SDGTs.  In connection with that designation, the Treasury Department stated that the Al-Aqsa Foundation funneled funds – including money donated for charitable purposes – to HAMAS.

139.    Nonetheless, NatWest took no steps to close its Interpal accounts.

140.    Years earlier, in or about January 2001, NatWest accepted deposits totaling $70,000.00 on behalf of Interpal from the Al-Aqsa organization in Yemen.

141.    On January 10, 2003, German authorities arrested Sheik Mohammed Ali Hasan al-Moayad, the head of the Al-Aqsa organization in Yemen, at the request of the U.S. Department of Justice and the Federal Bureau of Investigation.  The arrest took place after a year-long investigation of al-Moayad and undercover operations by the FBI's Joint Terrorism Task Force

---

[13] On July 31, 2002, German authorities closed the Al-Aqsa Foundation in Germany because of its support for HAMAS.  On January 1, 2003, the Danish government charged three Al-Aqsa Foundation officials in Denmark with supporting terrorism.  In April 2003, Dutch authorities blocked Al-Aqsa Foundation assets in The Netherlands based on information that funds were provided to organizations supporting terrorism in the Middle East.

that concerned his knowing and intentional efforts to provide material support and resources for Al-Qaeda and HAMAS.

142.    Prior to his arrest in Germany, Sheik al-Moayad had met with an undercover government informant and proffered proof of his prior fundraising on behalf of HAMAS by tendering to the undercover government informant a receipt from Interpal confirming a $70,000.00 donation from the Sheik's Al-Aqsa organization in Yemen.

143.    Sheik al-Moayad was subsequently convicted of providing material support to HAMAS in violation of 18 U.S.C. § 2339B.  In 2005, he was sentenced to 75 years in prison.

### 3.  NatWest's Continuing Support for HAMAS Following Interpal's Designation by the U.S. Government in 2003

144.    On August 19, 2003, a HAMAS suicide bombing of a bus resulted in the deaths of U.S. citizens.[14]

145.    Following this atrocity, President George W. Bush stated:

> At my direction, the Treasury Department has moved today to block and freeze the assets of six top HAMAS leaders and five non-governmental organizations that I am advised provide financial support to HAMAS.  By claiming responsibility for the despicable act of terror on August 19, HAMAS has reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress toward peace between Israel and the Palestinian people.

146.    Thereafter, Interpal, as one of the five non-governmental organizations to which President Bush referred, was designated as an SDGT on August 22, 2003.

147.    In an interview reported in The Guardian on August 28, 2003 (shortly after the U.S. Government designation), Mr. Hewitt, Chairman of Interpal, was quoted as saying: "We deal with people whether they are HAMAS or whether they are Fatah."

---

[14] Among those killed or injured were: Mordechai Reinitz, Yissocher Dov Reinitz, Goldie Zarkowsky, Eli Zarkowsky, Mendy Reinitz, Miriam Richter and Bshava Zarkowsky, all plaintiffs in *Applebaum, et al. v. National Westminster Bank, PLC*, 07-cv-916-DLI-RML.

148.    Even after Interpal's designation as an SDGT and its Chairman's public admission of its relationship to HAMAS, an FTO, NatWest took no action to cease its relationship with Interpal.

149.    On September 12, 2003, the European Union designated all of HAMAS (including its supposed "social wing") a terrorist organization.  Even then, NatWest took no action to close Interpal's accounts.

### 4.    **Specific Accounts and Transactions**

150.    Interpal is a pivotal part of HAMAS's fundraising infrastructure and a significant source of HAMAS's financing.

151.    For more than nine (9) years, defendant NatWest knowingly maintained numerous accounts for Interpal and collected, received, transmitted and provided millions of dollars on behalf of Interpal directly to agents of HAMAS in the PACT.

152.    These accounts include:

U.S. Dollar Account Number – 140-00-04156838

Euro Account Number – 60720508524882

Sterling Account Number - 60082295142940

153.    NatWest thereby provided HAMAS with a highly convenient method to collect and transfer funds in U.S. Dollars as well as Sterling and Euros.

154.    NatWest also provided Interpal with merchant banking services, directly and through another Royal Bank of Scotland subsidiary, thereby making it possible for Interpal to maintain merchant accounts with Mastercard, VISA and other credit card companies.

155.    That service allowed HAMAS to solicit contributions in dozens of currencies from around the world and allowed Interpal to solicit funds for HAMAS via its website at www.interpal.org.

156.    In addition, NatWest, with the help of financial products provided by its sister company, provided further substantial assistance to HAMAS by making it possible for British nationals to make direct contributions to Interpal by way of their employers' payroll department through a program called "Give As You Earn."

157.    Beginning at least as early as March 1996, defendant NatWest knew that it was providing financial services to HAMAS and that Interpal was collecting money for, and transmitting money to, HAMAS, an FTO.

158.    NatWest transferred funds directly to HAMAS-controlled entities on hundreds (if not thousands) of occasions.

159.    For example, on February 19, 2003, NatWest transferred £21,424 (approximately $34,083.40) to the Tulkarem Zakat (Charity) Committee Society, a HAMAS front organization. In connection with that transaction, NatWest charged a commission of £10.  At the time NatWest transferred that amount to HAMAS, both Interpal (the repository of the funds) and the Tulkarem Charitable Society (the HAMAS front that received the funds) had been designated as unlawful organizations by the Government of Israel due to their support for, or control by, HAMAS.

160.    The U.S. Department of Justice has identified the Tulkarem Charitable Society as an "organization, which operated on behalf of, or under the control of, HAMAS."

161.    On April 1, 2003, NatWest transferred another £17,974 (£18,000 minus commission, or approximately $28,465.40) from Interpal to the Tulkarem Zakat Committee.

162.    Likewise, on July 30, 2003, NatWest transferred £73,757 ($119,809.00) to the Jenin Charitable Society, debiting Interpal's Account Number 600822-95142940.  This transaction was apparently financed by the World Assembly of Muslim Youth ("WAMY"), a well-known Saudi "charity" linked to both HAMAS and Al Qaeda financing.[15]  At the time NatWest transferred this amount to HAMAS, WAMY (the source of the funds), Interpal (the repository of the funds) and the Jenin Charitable Society (the HAMAS front that received the funds) had all been designated as unlawful organizations by the Government of Israel due to their support for, or control by, HAMAS.

163.    One of Interpal's officers/directors, Mahfuzh Safiee, was an officer of WAMY, Ltd. (a European branch of WAMY).

164.    The U.S. Department of Justice has identified the Jenin Charitable Society as an "organization which operated on behalf of, or under the control of, HAMAS."

165.    NatWest did not cease providing enormous sums of money to HAMAS even after Interpal was formally designated an SDGT by President Bush on August 22, 2003.  On the contrary, millions of dollars continued to flow from NatWest accounts to HAMAS front organizations even after the U.S. Government designation of Interpal.

166.    For example, on November 5, 2003 (two months AFTER the official U.S. designation), NatWest transferred £32,329 ($54,322.40) to the Jenin Charitable Society, debiting Interpal's Account Number 600822-95142940.

167.    The transactions that NatWest conducted on behalf of Interpal and other HAMAS front organizations are precisely the type of transactions that Congress tried to interdict by enacting

---

[15] The head of the HAMAS Political Bureau, Khalid Mishal, attended the WAMY Conference in Riyadh in October 2002.  Mishal was designated an SDGT on August 22, 2003, pursuant to Executive Order No. 13224.

the criminal provisions of 18 U.S.C. §§ 2339B and 2339C and the civil provisions of 18 U.S.C. §2333(a).

### 5.   NatWest's Regulatory Obligations and Duty of Care

168.   All banks that have international operations or relationships with correspondent banks have a duty, based on international banking norms, to adopt know your customer ("KYC"), anti-money laundering ("AML"), and anti-terrorist financing ("ATF") standards, which are defined and enforced by the Financial Action Task Force ("FATF") and its supportive governments.

169.   The United Kingdom is a participant in the FATF.

170.   This duty is imposed upon officials and directors of all such banks and includes a due diligence obligation to monitor publicly accessible information and allegations in relation to "high risk" customers, which would include charities collecting funds from the public.

171.   This duty to monitor and profile charity customers arises independently of any particular transaction.

172.   Beginning with the creation of FATF in 1989, and especially since the collapse of the Bank of Credit and Commerce International and the enactment of the first European Union directive on the subject of terrorism financing in 1991, a consensus has evolved in the banking community concerning knowing your customer and anti-terrorist financing standards required by international banking institutions.

173.   These standards are encapsulated in written principles issued by FATF and the Basel Group of Bank Supervisors.

174.   In April 2002, the FATF issued a report entitled "Guidance for Financial Institutions in Detecting Terrorist Financing." The report was issued to all major international

financial institutions to provide guidance to "ensure that financial institutions do not unwittingly hide or move terrorist funds.  Financial institutions will thus be better able to protect themselves from being used as a conduit for such activity…"

175.    The FAFT report very clearly put NatWest on notice that:

Regardless of whether the funds in a transaction are related to terrorists for the purposes of national criminal legislation, business relationships with such individuals or other closely associated persons or entities could, under certain circumstances, expose a financial institution to significant reputational, operational, and legal risk.  This risk is even more serious if the person or entity involved is later shown to have benefited from the lack of effective monitoring or willful blindness of a particular institution and thus was to carry out terrorist acts.

176.    There are also standards developed by the Wolfsberg Group of banks that affect the correspondent banks of Wolfsberg Group member financial institutions.

177.    On July 16, 2002, the Royal Bank of Scotland Group (the "RBS Group"), NatWest's parent company, adopted new "Know Your Customer" guidelines and adopted the so-called Wolfsberg Principles for the Suppression of Terror Financing, thereby committing NatWest to implement: "procedures for consulting applicable [terrorism-related] lists and taking reasonable and practicable steps to determine whether a person involved in a prospective or existing business relationship appears on such a list."

178.    At the same time, NatWest's parent company publicly acknowledged that "[f]unds used in support of terrorism do not derive exclusively from criminal activities and differ from those associated with most existing money laundering offenses" and committed itself to "the ongoing monitoring of individual transactions on customer accounts …"

179.    In September 2002, a group of six major UK banks, including the RBS Group, issued a "Statement of Principles for Fighting Crime and the Financing of Terrorism."  The

document describes the RBS Group's supposed plan to institute AML controls, particularly on terrorist financing, and to cooperate with U.K. authorities in criminal investigations.

180.    All of the foregoing standards were, therefore, binding on NatWest.

181.    Accordingly, during the relevant time period, NatWest had an affirmative duty to monitor publicly available information and allegations about its customer, Interpal.

182.    NatWest also had an affirmative duty to monitor publicly available information and allegations about its customer's parent organization – the Union of Good – as well as publicly available information concerning the HAMAS-controlled entities to which its customer transferred millions of dollars.

183.    During the relevant time period, it was (and remains) the standard in the international banking industry for compliance departments at banks like NatWest to access, in detail, public allegations of misconduct by such "charities" or diversions of their funds to terrorist activities.

184.    In many cases, information linking payees of NatWest transactions and HAMAS could readily be obtained by simple Internet searches or by subscribing to a database or press clippings service.

## CLAIMS FOR RELIEF

185.    Plaintiffs' claims for relief herein conform to the operative claims for relief in Applebaum, as set forth in the parties' joint pretrial order and in the Applebaum plaintiffs' opposition to NatWest's motion for summary judgment.  Plaintiffs assert claims for relief predicated on primary liability for NatWest's violation of 18 U.S.C. § 2339B and its aiding and abetting of HAMAS under 18 U.S.C. § 2333(d).

## FIRST CLAIM FOR RELIEF

### COMMITING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. §§ 2333(a) AND 2339B(a)(1)

186.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

187.    By knowingly collecting and transferring funds for the benefit of HAMAS, the defendant has provided material support to a designated FTO under the AEDPA in violation of 18 U.S.C. § 2339B(a)(1).

188.    As stated above, the Union of Good and Interpal are major funding sources for HAMAS.

189.    By providing a wide range of vital financial services to these entities, defendant NatWest substantially assisted HAMAS in recruiting, rewarding, and providing incentives to suicide bombers and other terrorists.

190.    At all relevant times, NatWest knew of HAMAS's terrorist activities and that HAMAS had been designated an FTO by the United States Government.

191.    Because it knowingly provided material support to a designated FTO, NatWest is civilly liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## SECOND CLAIM FOR RELIEF

## AIDING AND ABETTING FOREIGN TERRORIST
## ORGANIZATIONS IN VIOLATION OF 18 U.S.C. § 2333(d)

192.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

193.     Plaintiffs assert this cause of action under 18 U.S.C. § 2333(d) (Justice Against Sponsors of Terrorism Act ("JASTA") § 2b).

194.     Plaintiffs were all injured by acts of international terrorism, as defined by 18 U.S.C. § 2331.  The attacks that injured Plaintiffs: (a) involved violence and endangered human life; (b) would have violated federal and state criminal law, had they been committed in the United States; (c) appeared to be intended to intimidate or coerce the civilian populations of Israel and the United States, to influence the policies of the Israeli and American governments, and to affect the policies of those governments through violent action; and (d) occurred primarily outside the United States and transcended national boundaries in that HAMAS raised money internationally, intended to impact the citizens and governments of Israel and the United States, and operated internationally and sought asylum in multiple countries in the Middle East.

195.     Plaintiffs are nationals of the United States and/or their relatives, survivors, or heirs.

196.     At all relevant times, HAMAS was a designated FTO.

197.     HAMAS committed, planned, and authorized each of the terrorist attacks that injured Plaintiffs.

198.     NatWest provided substantial assistance to HAMAS by transferring significant sums of money to HAMAS institutions and maintaining bank accounts for Interpal while NatWest knew HAMAS was a designated FTO that engaged in terrorism.

199.   NatWest's acts were a substantial factor in causing Plaintiffs' injuries, and Plaintiffs' injuries were a foreseeable result of the significant sums of money NatWest provided to HAMAS.

200.   NatWest aided and abetted HAMAS within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." See JASTA § 2b.

201.   NatWest is therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

a.   Enter judgment against NatWest and in favor of each Plaintiff for compensatory damages in amounts to be determined at trial;

b.   Enter judgment against NatWest and in favor of each Plaintiff for treble damages in amounts to be determined at trial;

c.   Enter judgment against NatWest and in favor of each Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

d.   Enter an Order declaring that NatWest has violated, and is continuing to violate, the Antiterrorism Act, 18 U.S.C. § 2331 et seq.; and

       e.       Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: December 31, 2018
       New York, New York       Respectfully Submitted,

**STONE BONNER & ROCCO LLP**

By:  /s/ James P. Bonner
James P. Bonner (jbonner@lawsbr.com)
Patrick L. Rocco (procco@lawsbr.com)
Susan M. Davies (sdavies@lawsbr.com)
1700 Broadway, 41st Floor
New York, New York  10019
(212) 239-4460

**HEIDEMAN NUDELMAN & KALIK, PC**
Richard D. Heideman *
Noel J. Nudelman
Tracy Reichman Kalik*
1146 19th Street, NW, Fifth Floor
Washington, DC  20036
(202) 463-1818

**SAYLES WERBNER P.C.**
Mark S. Werbner*
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700

**PERLES LAW FIRM, P.C.**
Steven R. Perles*
Ed Macallister*
1050 Connecticut Ave., NW, Suite 500
Washington, D.C.  20036
(202) 955-9055

**THE DAVID LAW FIRM, P.C.**
Jonathan David*
301 Congress Avenue, Suite 1910
Austin, Texas  78701-2959

**Attorneys for Plaintiffs**

* Not admitted in E.D.N.Y